Filed 6/5/13  In re Y.S. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Y.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D062872 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14558) |
| v. | |
| JENNIFER D. et al, | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Laura Birkmeyer, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Joseph S.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Jennifer D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer D. and Joseph S. appeal orders terminating their parental rights to their daughter, Y.S., under Welfare and Institutions Code section 366.26.[1]  We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

Jennifer D. is the mother of 11 children.  Joseph S. is the father of Jennifer's three youngest children, Victoria S., N.S., and Y.S.  This proceeding concerns only Y.S. Jennifer and Joseph have a history of domestic violence.  In March 2009, Jennifer's nine oldest children, including newborn Victoria, were removed from her custody through Los Angeles County dependency proceedings and placed with relatives.  N.S. was born in April 2010.  She remained in Jennifer and Joseph's care under a voluntary services plan. Six months later, the court returned Victoria to her parents' home.

In April 2011, two-year old Victoria died from injuries sustained while in the parents' care.  The Los Angeles County Department of Children and Family Services (DCFS) detained N.S. in protective custody.  Jennifer and Joseph moved to San Diego

---

[1]    All further statutory references are to the Welfare and Institutions Code.

County, where they lived with Jennifer's aunt and uncle, the T.'s. Y.S. was born in October 2011.

In December 2011, the San Diego County Health and Human Services Agency (Agency) detained Y.S. in protective custody and filed a petition alleging she was at substantial risk of abuse or neglect because her sibling had suffered fatal injuries while in the parents' care. (§ 300, subd. (j).) In January 2012, the medical examiner concluded that Victoria's death was a homicide caused by blunt force trauma to her chest and abdomen. At the time of her death, Victoria was suffering from acute pneumonia, which had not been diagnosed or treated. Victoria had not grown in height and had lost weight after she was returned home. Witnesses reported that her parents did not feed her when she was hungry. The Agency filed an amended petition alleging Y.S. was in need of protection because her parents had caused the death of another child through abuse or neglect. (§ 300, subd. (f).)

On March 1, 2012, Jennifer and Joseph were arrested and charged with Victoria's murder. (Pen. Code, § 187.) They remained in custody throughout the remainder of Y.S.'s dependency proceedings.

In June, the juvenile court adjudicated Y.S. a dependent of the juvenile court and set a section 366.26 hearing. The Agency later placed Y.S. with the T.'s.

The section 366.26 hearing was heard on October 18, 2012. Jennifer and Joseph were represented by counsel but were not present. They did not object to the admission of the Agency's section 366.26 reports in evidence, cross-examine the social worker or present any affirmative evidence. Jennifer asked the court to apply the beneficial

3

parent/child and sibling relationship exceptions to termination of parental rights. Without specifying any legal grounds for his request, Joseph asked the court to maintain his parental rights and select a plan of guardianship or long-term foster care for Y.S.

The Agency reported that Y.S. was happy and healthy. She was in the care of the T.'s, who wished to adopt her. Until her arrest, Jennifer had maintained consistent visitation and contact with Y.S. Jennifer did not believe that it was in Y.S.'s best interests to visit her while she was incarcerated but continued to contact the social worker to ask about Y.S.'s welfare. The relative caregivers of Y.S.'s siblings facilitated some visitation between Y.S. and her siblings, and remained in contact with the T.'s.

The court found that Y.S. was likely to be adopted within a reasonable time if parental rights were terminated. The court noted that the Agency's report indicated that the T.'s were dedicated to adopting Y.S., and did not express an interest in guardianship. The court found that none of the exceptions under section 366.26, subdivision (c)(1) applied, and terminated parental rights.

## DISCUSSION

Jennifer asserts the court erred when it determined the beneficial parent-child relationship exception did not apply and terminated her parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Joseph argues the court should not have selected a plan of adoption because there was not substantial evidence to show that Y.S.'s caregivers had been informed that they could choose guardianship over adoption. Alternatively, he contends the court lacked sufficient evidence to terminate parental rights because the evidence demonstrated that guardianship was Y.S.'s preferred permanency plan. Joseph also contends the court

4

failed to make the finding that he was Y.S.'s presumed father. Each parent joins in and adopts the other parent's arguments. (Cal. Rules of Court, rule 8.200(a)(5).)

A

*The Court Did Not Err When It Denied Joseph's Request to Select*
*A Permanent Plan of Guardianship for Y.S.*

At a permanency plan hearing, the court may order one of three alternatives—adoption, guardianship or long-term foster care.[2] (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) If the court determines that a child is likely to be adopted, the court must order a plan of adoption unless a party proves that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivisions (c)(1)(A) or (c)(1)(B). (§ 366.26, subd. (c)(1); cf. *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

One of those exceptions occurs when the child is living with a relative who is unable or unwilling to adopt the child (for reasons other than an unwillingness to accept legal or financial responsibility for the child) but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child. (§ 366.26, subd. (c)(1)(A).)

---

[2] Other permanency options are available for the child if he or she is an Indian child within the meaning of the Indian Child Welfare Act. (25 U.S.C. § 1901 et seq.; § 366.26, subd. (b).)

5

Whenever the court orders a hearing under section 366.26, it is required to direct the social services agency to prepare an assessment that shall include, as relevant here: "[t]he relationship of the child to any identified prospective adoptive parent or legal guardian, the duration and character of the relationship, the degree of attachment of the child to the prospective relative guardian or adoptive parent, the relative's or adoptive parent's strong commitment to caring permanently for the child, [and] the motivation for seeking adoption or guardianship . . . ."  (§§ 366.21, subd. (i)(1)(E), 366.22, subd. (c)(1)(E).)  The social worker is required to include in the assessment the prospective relative guardian or adoptive parent's "understanding of the legal and financial rights and responsibilities of adoption *and* guardianship."  (§§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(E) (italics added).)

Joseph has forfeited his argument the assessment did not include information showing that the T.'s understood the legal and financial rights and responsibilities of both adoption and guardianship.  "A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.  [Citations.]  Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.  [Citations.]"  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222 (*Dakota H.*).)

Joseph did not bring to the court's attention his assertion that the section 366.26 assessment was inadequate or that the T.'s wished to pursue guardianship and not adoption.  Had he done so, the court could have considered his claim and, if it found his

6

argument meritorious, determined and applied the appropriate legal standard. A party may not assert theories on appeal which were not raised in the trial court. (*Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489.) Joseph did not object when the court found that "the [assessment] indicates that [the T.'s] do not wish to be [Y.S.'s] legal guardians, they are dedicated to the concept of adoption." The record also shows that while Joseph asked the court to order a plan of guardianship or long-term foster care for Y.S., he did not attempt to show that the T.'s were unable or unwilling to adopt Y.S. Joseph has forfeited the right to assign error on appeal.

Even were the matter not forfeited on appeal, we are not persuaded that the court erred when it found that the T.'s wanted to adopt Y.S. Although the social worker should have included a discussion of the T.'s understanding of the legal and financial rights and responsibilities of both adoption *and guardianship* in the assessment,[3] there is no evidence in the record to support the argument that the T.'s were unwilling to adopt Y.S. and preferred to become her legal guardians. "[E]ven if the assessment is incomplete in some respects, the court will look to the totality of the evidence; deficiencies go to the weight of the evidence and may ultimately prove insignificant." (*In re John F*. (1994) 27 Cal.App.4th 1365, 1378.) The record clearly shows that the T.'s were committed to adopting Y.S. The uncontroverted evidence shows that the T.'s were actively completing their adoptive home study and looking forward to making Y.S. a permanent member of their family as soon as possible. They were participating in an

3    The Agency implicitly acknowledges that Y.S.'s assessment did not fully comply with all statutory requirements under section 366.21, subdivision (i)(1)(E).

adoptive home study.  The T.'s loved Y.S. as their own child and wanted to make her a permanent part of their family.  They wanted to move forward with the adoption as soon as possible.  The social worker had no concerns about the T.'s commitment to adoption.  She believed that the T.'s adoptive home study would be completed in a timely manner.  On this record, the court could reasonably find that the T.'s were willing and able to adopt Y.S., and the relative guardianship exception under section 366.26, subdivision (c)(1)(A) did not apply.

B

*There Is Substantial Evidence to Support the Finding the*
*Parent/Child Beneficial Relationship Exception to Termination of*
*Parental Rights Did Not Apply*

Another exception to termination of parental rights applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  To overcome the statutory preference for adoption, the parent must prove that he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827; *In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324.)

This court has recognized that interaction between parent and child will almost always confer some incidental benefit to the child.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H*.).)  Under section 366.26, subdivision (c)(1)(B)(i), "benefit" means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home

8

with new, adoptive parents." (*Autumn H.*, at p. 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.)

We determine whether there is substantial evidence to support the court's ruling by reviewing the evidence most favorably to the prevailing party, and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Jennifer argues she maintained regular visitation and contact with Y.S. and continuing the parent/child relationship would promote Y.S.'s well-being to greater extent than adoption. Although the juvenile court noted that Jennifer did not maintain regular visitation and contact with Y.S. after she was incarcerated, it placed greater emphasis on weighing the benefits of maintaining the parent/child relationship against the benefits that Y.S. would gain by adoption. The court found that in view of Y.S.'s brief relationship with her parents and their history and circumstances, Y.S. would gain more benefit from adoption than she would from maintaining her relationship with her parents.

There is ample evidence to support the court's finding that termination of parental rights would not be detrimental to Y.S. Y.S. was two months old when she was removed from her parents' custody. Although Jennifer consistently visited Y.S. and was attentive to her needs for approximately two-and-a-half months, she was subsequently incarcerated

9

on charges that she murdered her two-year old child. Jennifer remained in jail during Y.S.'s dependency proceedings. She was unable to maintain any type of relationship with Y.S. that would be meaningful or beneficial to her one-year old daughter. Jennifer's record as a parent to her ten other children sadly speaks for itself.

The T.'s were present at the hospital when Y.S. was born. She lived in their home for the first two months of her life. The T.'s consistently visited her in foster care until the Agency placed her in their home in August 2012. At the time of the section 366.26 hearing, Y.S. was doing well and was very attached to her caregivers. She was happy and meeting all her developmental milestones. The T.'s loved Y.S. as their own child and provided a safe, stable and secure home to her. They remained in contact with her siblings' relative caregivers and facilitated visits with her siblings. The record fully supports the court's finding that Y.S. would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

C

*Presumed Father Finding*

Joseph was married to Jennifer at the time of Y.S.'s birth. (Fam. Code, § 7540.) He contends the court did not make a finding that he was Y.S.'s presumed father, and requests that this court correct the error or remand the matter to the juvenile court with instructions to make the appropriate finding. Joseph acknowledges the court apparently intended to make a presumed father finding and treated Joseph as if he were Y.S.'s presumed father, the court did not in fact find that he was the presumed father.

10

Joseph's argument lacks merit. The record shows that the court amended the petition by interlineation at the December 7, 2011 detention hearing "to reflect presumed status for father, Joseph S." Joseph did not include the record transcript of the December 7, 2011 hearing in the record on appeal. "It is the appellant's affirmative duty to show error by an adequate record. [Citation.] 'A necessary corollary to this rule [is] that a record is inadequate, and appellant defaults, if the appellant predicates error only on the part of the record he provides the trial court, but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed. [Citation.]' " (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435.) Any further references in the minute orders describing Joseph as an alleged father appear to be clerical error, which could have been easily corrected had the error been brought to the juvenile court's attention. (*Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222 [explaining principles of forfeiture].) In addition, the issue of Joseph's status as alleged or presumed father has been rendered moot by the termination of his parental rights to Y.S. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391 [an order terminating parental rights effectuates a complete and final legal termination of the parental relationship].)

DISPOSITION

The findings and orders are affirmed.


                                                    O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.